IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | |
| JEAN BROWN, | * | Criminal No. SAG-11-0050 |
| | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Jean Brown, who is presently in Bureau of Prisons custody serving a life sentence at FCI Aliceville, has filed a Motion for Compassionate Release. ECF 538. The Government filed an opposition, ECF 552. For the reasons that follow, Brown's Motion is DENIED.

**I.     Factual Background**

The following facts are derived from the Government's summary of the facts proved at trial, as included in Brown's Amended Presentence Report. ECF 375.

> From at least 2000 until 2010, Jean Brown ran a marijuana trafficking organization that transported large amounts of marijuana from Arizona and California to Maryland for distribution in Maryland, Pennsylvania, New York and Washington, D.C. Brown used tractor trailers and car carriers to transport the money to the West Coast and the marijuana back to the East Coast. Brown's shipments came monthly, if not more frequently, in amounts which were initially a few hundred pounds. By 2005, when she met Carl Smith, the monthly or bi-monthly shipments were 1,000 pounds of marijuana per shipment. The marijuana was purchased for approximately $500 per pound and sold for $1,000 per pound, for a revenue per month of $1,000,000. Brown transported the majority of her profits to Jamaica, where she was using it to build homes.

> The main method of transportation of the marijuana was by tractor-trailer. Brown owned and controlled several trucking companies over the years, usually held in the name of another co-conspirator, and would use her trucks to transport large quantities of currency to Arizona and to return with a load of marijuana acquired from Mexican sources of supply. Former co-defendant Dmytro Holovko (aka "the Russian") and Herbert Gentle (aka "Bird") were two of Brown's drivers. In this fashion, Brown acquired approximately one ton of marijuana per month,

purchasing it for approximately $500 per pound and selling it for double the price. As a result, her profit was approximately $1,000,000 per month.

From approximately 2000 until sometime around 2006 or 2007, Brown's primary partner was Wilmott Kerr (aka "Tough Luck") who showed Brown how to create a trucking business to provide an air of legitimacy while still smuggling large amounts of marijuana from the West Coast. Kerr and Brown shared a personal relationship which can only be described as volatile. In 2006 or 2007, Brown began doing business with Carl Smith, who already had a marijuana connection in Arizona. While Brown did not immediately cut ties with Kerr, she began phasing her operations to work more with Smith. As with Kerr, Brown also began a volatile personal relationship with Smith.

Brown's primary customers for the marijuana were individuals in Pittsburgh named "Zander" and "Yankee", though there will be testimony that Brown also distributed marijuana in Baltimore, Washington, D.C., and New York. Several witnesses will testify about their trips to Pittsburgh with Brown (and sometimes without her, but at her direction) to drop off marijuana or pick up money from Zander or Yankee.

In 2007 or 2008, Brown met Hubert Downer (aka "Doc") and Peter Blake (aka "Senator"), and agreed to provide them with marijuana to sell. Blake took an immediate liking to Brown, and the two spent a considerable amount of time together. Brown made several promises to Blake that she would involve him more in the business, but always kept him at arm's length.

It was common for Brown to keep people around her to perform everyday tasks and errands for her, or to simply accompany Brown as she conducted her affairs. These tasks and errands could range from the mundane (picking up furniture), to the extreme (flying to Arizona in the middle of the night to accuse Smith of cheating on her), to the illegal (carrying bulk cash to Jamaica, and delivering marijuana). At various times during the conspiracy, Michael Knight ("Knight"), Tamara Henry, Dean Myrie (aka "Journey"), Jason Carnegie ("Dollar"), Clive White ("Kung Fu"), and others acted in this capacity for Brown.

Knight not only performed errands for Brown; he was also a close associate in her marijuana trafficking. He accompanied her to Pittsburgh to deliver marijuana, carried money to Jamaica for her, and held large amounts of cash for her in his apartment he shared with his sister, Calline Fyffe ("Fyffe").

On Christmas Day, 2008, Brown asked Knight, Debbie Shipp ("Shipp") and Angella Perez ("Perez") to carry approximately $565,000 in cash to Jamaica for her. The three were stopped by authorities in Montego Bay, Jamaica, who confiscated the money. Brown ordered the three couriers to lie and tell the authorities the money was theirs, in an unsuccessful effort to get it back. Brown threatened Shipp and Perez in order to make them lie as she wished.

Nearly a year later, on December 16, 2009, Knight was holding $1,000,000 in cash for Brown in a file cabinet he kept in the apartment he shared with Fyffe. Brown

2

contacted Knight to let him know that she needed the money and would be coming to get it. Smith was scheduled to drive to Arizona that night with Gentle and Holovko to use the money to buy more marijuana. When Brown and Smith came to collect the money, they learned that $250,000 was missing. Brown became very upset with Knight and began screaming at him and hitting him, demanding her money. She and Smith went to Brown's apartment to pick up Myrie. Myrie drove the four of them to an apartment in White Marsh, Maryland. On the way there, Brown was beating Knight in the face and at some point, she and Smith tied his hands with telephone cord.

At the apartment, Brown continued her beating and questioning of Knight but Knight insisted that he did not have the money. Leaving Myrie to guard Knight, Brown and Smith left to pick up Blake and Downer, and instructed them to force Knight to talk. When their efforts failed, Brown ordered Blake to kill Knight, telling him that she would give him and Downer $100,000 to do the murder and dispose of Knight's body. Blake took a kitchen knife and stabbed Knight multiple times as he lay in the bathtub.

Smith left that night for Arizona with Gentle and Holovko. Over the next few days, culminating on the night of the December 18-19, 2009 snow storm, Brown, Blake, Downer and Myrie used two different power saws to cut off Knight's legs and then dispose of the legs and Knight's torso in dumpsters.

In the aftermath of Knight's murder, Brown returned to Florida. On January 13, 2010, she was questioned at her home in Miramar, Florida, by Baltimore County Police Detectives Carroll Bollinger and Kevin Klimko about the disappearance of Knight. Knight's sister, Fyffe, had reported Knight missing on December 19. Shortly after the visit by the BPD, Brown had Carnegie drive her to Arizona, where she met with Mendez, who drove her across the border to Mexico. At the time, Mendez was an employee of the Mexican Consulate in Tucson, Arizona, who knew of Brown through his cousin "Carlos" who, along with his partner, "Benny," had been acquiring marijuana from Mexican suppliers and providing it to Smith for some time.

In Mexico, Brown joined Smith, whom Mendez had transported to Mexico sometime earlier. The two stayed with Mendez's family, including Campa, who was dating Mendez's sister, and discussed arrangements for continuing their business relationship using Campa, who had ties to the Arellano Felix Organization ("AFO"), a Tijuana-based drug cartel, as their source of supply. During the time Smith and Brown were in Mexico, Campa negotiated with them and a drug dealer to bring large amounts of marijuana to the U.S.

After spending a few days in Mexico, Brown traveled to Jamaica in February, 2010. Smith, who had been joined in Mexico by his girlfriend, Carolina Adigun, followed her there in March. In Jamaica, Smith expressed his desire to end his business relationship with Brown and attempted to get his share of the marijuana profits from her. Up to that point, Brown had held the majority of the proceeds and repatriated them to Jamaica. Brown resisted him, violently at times. Outside of the apartment

complex Smith owned, Brown burned Smith's clothes, vandalized his car, and shouted that the two of them had killed people. At another time, Brown encountered Smith and Adigun on the street and chased them with her car, eventually pointing a handgun at Smith and Adigun.

In April, 2010, Smith and Adigun returned to Mexico and stayed again with Campa for a few weeks. Campa and Smith continued to discuss the sale of marijuana. Smith and Campa planned to have a corrupt CBP agent smuggle Smith and Campa across the border. Adigun had legal status and would cross on her own. Smith and Adigun were eager to return, but Campa continued to delay the trip. Finally, on April 26, 2010, Campa informed them it was time to cross the border. Smith and Adigun got into Campa's SUV along with an associate of Campa, Alvarez. Alvarez had been with Smith, Adigun and Campa several times over their visit in Mexico, often discussing the drug trade with Smith and Campa. Alvarez also told them that he was a hit man for the cartels and had murdered many people.

With Campa driving, Alvarez in the passenger seat, and Smith and Adigun in the back, they set out for the border. On the drive, Campa pulled over. Adigun saw him walk to the back tire and reach into the wheel well. Campa then returned to the driver's seat and started to pull out. Campa handed something to Alvarez who immediately pulled out a gun and shot Smith twice in the head, killing him instantly. Alvarez then turned to shoot Adigun, who was able to deflect the gun, but was nevertheless struck several times. She was hit in the ear, hand, and pelvis. Campa and Alvarez, thinking that both were dead, began discussing where to dispose of the bodies. Adigun asked what she had done to deserve the shooting. Campa said that "she" paid him to do it, and paid him well. He also stated that "this is what happens when you mess with the boss lady's man." Alvarez and Campa continued to talk, and Adigun was able to throw herself from the open window of the vehicle and run across the highway. She was picked up by passing workers and taken to the hospital. Although she survived the injuries, Adigun was newly pregnant at the time, and lost the baby.

Subsequent to the deaths of Knight and Smith, Peter Blake introduced Brown to a new source of supply in California. This scheme involved packaging the marijuana purchased in California in what appeared to be cans of tomato sauce and shipping it to Maryland through common carriers. This new phase of the scheme was coordinated by Mowayne McKay, a young associate of Blake's, who assisted Brown with the purchasing and packaging of marijuana from California along with Hendrickson and Carnegie. Downer also purchased marijuana from California using the same tomato can method, and in March 2011, he was arrested while driving a blue van with several cans of actual tomato sauce. These cans had been mixed in with the cans containing marijuana to help avoid detection, in case any cans were opened by law enforcement.

At her trial in 2013, a jury found Brown guilty of all four charged offenses: conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana, kidnapping

4

of Michael Knight in aid of racketeering, conspiracy to commit first-degree murder of Michael Knight in aid of racketeering, and the first-degree murder of Michael Knight in aid of racketeering. ECF 345. At sentencing, United States District Judge William D. Quarles sentenced Brown to concurrent life terms in prison for each of counts one, two, and four, with a concurrent 120-month sentence for the conspiracy charged in count three. ECF 385.

Brown now seeks a reduction of her sentence to time served, or approximately 140 months. ECF 538.

## II.     Analysis

As part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C. § 3582(c), permitting courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239-41 (2018). While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons." § 603(b)(1). Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied: (1) the defendant must have exhausted all administrative remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.[1] *Id.* Once a motion is for compassionate release is properly filed, the Court follows a three-step inquiry: (1) determining whether "extraordinary and compelling reasons" render the inmate eligible for compassionate release; (2) considering whether the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction; and (3) ensuring that the reduction is "consistent

---

[1] The Government does not contest that this administrative prerequisite has been satisfied.

with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

### a. Extraordinary and Compelling Circumstances

To meet the first element for consideration under the First Step Act, then, Brown needs to demonstrate extraordinary and compelling circumstances. Brown cites the fact that her minor daughter, who is ten years of age, is residing with family members in Jamaica who are suffering from health issues. ECF 538. She argues that her daughter is in need of a parent. *Id.* It is worth noting, however, that Judge Quarles, at sentencing, deemed Brown to be responsible for the death of Smith, her daughter's father. ECF 458 at 24 ("[T]here is sufficient evidence that the motive force behind the shooting, regardless of who pulled the trigger, was the Defendant."). Setting that aside, the First Step Act includes "death or incapacitation of a family member who is a caregiver" as an example of a potential extraordinary and compelling reason which might permit this Court to consider release. Brown, however, has not shown death or incapacitation of a family member here. Despite her age and medical conditions, Brown's mother remains alive and there is no evidence of her incapacitation. Thus, Brown has not shown extraordinary and compelling circumstances relating to her mother's role as caregiver for her minor child.[2]

Brown also cites the pandemic-related difficulties at her jail facility as an extraordinary and compelling reason justifying her release. ECF 538. The BOP's efforts to prevent transmission within its facilities unquestionably present added hardships to the incarcerated population, as the BOP enacts various measures to best protect and care for its inmates. *See United States v. Hiller*, Cr. No. ELH-18-389, 2020 WL 2041673 * 3-4 (D. Md. Apr. 28, 2020). However, those measures

---

[2] As the Government notes, BOP's program statements would also require a showing that the deceased or incapacitated caregiver is the only family member capable of caring for the child, and that standard has been adopted by multiple courts. Brown is unlikely to meet that criterion, because her Presentence Investigation Report reflects a number of other prospective caregivers, including Brown's several adult siblings and two adult children.

do not create extraordinary and compelling reasons to release all incarcerated individuals. *See, e.g.*, *United States v. Proctor*, Cr. No. DKC 04-160, 2020 WL 1864584 (D. Md. Apr. 14, 2020) ("The current pandemic state of emergency is of great concern to the entire country ... Immediate release, however, is not a panacea . . . ."). Moreover, as inoculation becomes more prevalent within BOP facilities, inmates will be more protected from complications and some of the more dramatic measures may be alleviated, allowing conditions at BOP facilities to return to pre-pandemic standards.

Certainly, an inmate's particularly acute risk of COVID-19 complications has been deemed to be an extraordinary and compelling reason in certain cases. However, other than citing the general conditions in her facility, Brown does not suggest that she is at any particular increased risk of severe complications from COVID-19 as a result of health conditions or other personalized factors. Thus, this Court cannot conclude that the pandemic creates an extraordinary and compelling reason warranting further consideration of her release.

Finally, Brown appears to contend that some combination of rehabilitation and her minor role in the offense warrants a reduced sentence. ECF 538. Her argument seeks exactly the type of reconsideration of an earlier sentencing decision that the law proscribes. *See United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) (internal quotation omitted). Rehabilitation alone is not an extraordinary and compelling reason. *See* 28 U.S.C. § 994(t). Accordingly, Brown is ineligible for further consideration of compassionate release, in the absence of evidence of any extraordinary and compelling reason.

### b. § 3553(a) Factors

Even had Brown established an extraordinary and compelling reason entitling her to further consideration, 18 U.S.C. § 3553(a) prescribes the factors the Court must assess in determining whether it should reduce a defendant's sentence. *See United States v. Wirsing*, 943 F.3d 175, 186

(4th Cir. 2019); *United States v. Logan*, Cr. No. CCB-10-0203, 2019 WL 3391618 *1 (D. Md. July 26, 2019). Those factors are (1) "the nature and circumstances of the offense;" (2) "the history and characteristics of the defendant;" (3) "the need to protect the public from further crimes of the defendant;" and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). The Court may also consider the defendant's conduct since her conviction. *See Logan*, 2019 WL 3391618 at *1.

Beginning with the nature and circumstances of her offenses, Brown's offenses could hardly be more serious: she served as the leader of a significant drug conspiracy and personally committed or ordered two murders in furtherance of the conspiracy's activities. Her motion for compassionate release, which strives to downplay her role as found by the jury and Judge Quarles, certainly does not indicate a recognition and acceptance of responsibility for her violent acts.

Brown's history and characteristics do not weigh in her favor either. In the Presentence Investigation Report, she recounted having grown up in a loving, stable family environment. ECF 375 ¶ 92. The Court certainly recognizes, and does not discount, Brown's meaningful accomplishments during her term of imprisonment, including her successful completion of a wide variety of classes. ECF 538-1. However, as the Government notes, Brown's disciplinary record, while not horrendous, has been less than stellar. She has at least eight sanctioned incidents, though most are 300-level, or less serious, infractions. ECF 552-3. At best, then, the Court views the history and characteristics of the defendant as a neutral factor, neither supporting nor counseling against a sentence reduction.

Turning to the third factor, the need to protect the public from further crimes of the defendant, the Court has absolutely no assurance that, if released, Brown would abstain from the type of serious and violent criminal conduct that led to her sentence. Her continued denial or

minimization of her involvement in the offenses of conviction undermines any notion that she could be trusted to abide by the law.  Thus, there is an acute continued need to protect the public from her conduct.

The final § 3553(a) factor is the need to avoid unwarranted sentence disparities.  The life sentence imposed by Judge Quarles is entirely appropriate for a person convicted of both being the leader of a significant drug trafficking organization and committing murder in aid of racketeering, particularly when the Government has also adduced sufficient evidence that the defendant ordered a second murder.  It would be the reduction of Brown's sentence to the 140 months she has served which would epitomize an unwarranted sentence disparity.

In total, then, even if the second factor is deemed neutral, the first, third, and fourth § 3553(a) factors would weigh strongly against reducing Brown's sentence, assuming that she had been able to demonstrate the extraordinary and compelling reason needed to trigger such analysis.

### III. Conclusion

In conclusion, after considering all of the relevant factors, this Court concludes that Brown has not established an extraordinary and compelling reason to justify her release, and that even if she had, her current sentence is most appropriate to accomplish the objectives described in 18 U.S.C. § 3553(a).  Accordingly, Brown's Motion for Compassionate Release is DENIED.

A separate Order will ISSUE.

DATED:  April 2, 2021                                  /s/
                                                                Stephanie A. Gallagher
                                                                United States District Judge