**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | |
| | * | |
| **JEAN BROWN,** | * | **Criminal No. SAG-11-0050** |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AMENDED MEMORANDUM OPINION

Jean Brown, who is presently in Bureau of Prisons custody serving a life sentence at FCI Aliceville, filed a Motion for Compassionate Release. ECF 538. The Government filed an opposition, ECF 552. Having received no timely reply to that opposition, this Court issued a memorandum opinion and order denying the motion on April 2, 2021. ECF 559, 560. Two months later, however, on June 2, 2021, Brown filed an "addendum" to her already-decided motion. ECF 569.

On May 5, 2022, Brown filed a "motion for summary judgment" in which she argued that the Government had never filed an opposition, and asked about the status of her motion. ECF 578. Because it became evident that Brown had not been receiving the correspondence and documents pertaining to her case, the Government investigated and determined that it had used the incorrect address for mailing. ECF 579. This Court therefore issued an order allowing Brown an opportunity to respond to the Government's opposition, ECF 580, which she did on June 7, 2022. ECF 586.

In the meantime, however, Brown also filed a notice of appeal to the Fourth Circuit, ECF 583, which temporarily divested this Court of jurisdiction over the case. Now that the Fourth Circuit has issued a mandate dismissing the appeal for failure to prosecute, ECF 594, her motion

for compassionate release is now fully briefed and ready for re-review. This Court requested that the Government provide updated disciplinary and medical records for Brown, which it did on November 10, 2022. ECF 609-10. This Court now issues this amended memorandum opinion taking into account all of the filings referenced above. For the reasons that follow, Brown's Motion is again DENIED.

## I.   Factual Background

The following facts are derived from the Government's summary of the facts proved at trial, as included in Brown's Amended Presentence Report. ECF 375.

> From at least 2000 until 2010, Jean Brown ran a marijuana trafficking organization that transported large amounts of marijuana from Arizona and California to Maryland for distribution in Maryland, Pennsylvania, New York and Washington, D.C. Brown used tractor trailers and car carriers to transport the money to the West Coast and the marijuana back to the East Coast. Brown's shipments came monthly, if not more frequently, in amounts which were initially a few hundred pounds. By 2005, when she met Carl Smith, the monthly or bi-monthly shipments were 1,000 pounds of marijuana per shipment. The marijuana was purchased for approximately $500 per pound and sold for $1,000 per pound, for a revenue per month of $1,000,000. Brown transported the majority of her profits to Jamaica, where she was using it to build homes.

> . . .

> The main method of transportation of the marijuana was by tractor-trailer. Brown owned and controlled several trucking companies over the years, usually held in the name of another co-conspirator, and would use her trucks to transport large quantities of currency to Arizona and to return with a load of marijuana acquired from Mexican sources of supply. Former co-defendant Dmytro Holovko (aka "the Russian") and Herbert Gentle (aka "Bird") were two of Brown''s drivers. In this fashion, Brown acquired approximately one ton of marijuana per month, purchasing it for approximately $500 per pound and selling it for double the price. As a result, her profit was approximately $1,000,000 per month.

> From approximately 2000 until some time around 2006 or 2007, Brown's primary partner was Wilmott Kerr (aka "Tough Luck") who showed Brown how to create a trucking business to provide an air of legitimacy while still smuggling large amounts of marijuana from the West Coast. Kerr and Brown shared a personal relationship which can only be described as volatile. In 2006 or 2007, Brown began doing business with Carl Smith, who already had a marijuana connection in

Arizona. While Brown did not immediately cut ties with Kerr, she began phasing her operations to work more with Smith. As with Kerr, Brown also began a volatile personal relationship with Smith.

Brown's primary customers for the marijuana were individuals in Pittsburgh named "Zander" and "Yankee", though there will be testimony that Brown also distributed marijuana in Baltimore, Washington, D.C., and New York. Several witnesses will testify about their trips to Pittsburgh with Brown (and sometimes without her, but at her direction) to drop off marijuana or pick up money from Zander or Yankee.

In 2007 or 2008, Brown met Hubert Downer (aka "Doc") and Peter Blake (aka "Senator"), and agreed to provide them with marijuana to sell. Blake took an immediate liking to Brown, and the two spent a considerable amount of time together. Brown made several promises to Blake that she would involve him more in the business, but always kept him at arm's length.

It was common for Brown to keep people around her to perform every day tasks and errands for her, or to simply accompany Brown as she conducted her affairs. These tasks and errands could range from the mundane (picking up furniture), to the extreme (flying to Arizona in the middle of the night to accuse Smith of cheating on her), to the illegal (carrying bulk cash to Jamaica, and delivering marijuana). At various times during the conspiracy, Michael Knight ("Knight"), Tamara Henry, Dean Myrie (aka "Journey"), Jason Carnegie ("Dollar"), Clive White ("Kung Fu"), and others acted in this capacity for Brown.

Knight not only performed errands for Brown; he was also a close associate in her marijuana trafficking. He accompanied her to Pittsburgh to deliver marijuana, carried money to Jamaica for her, and held large amounts of cash for her in his apartment he shared with his sister, Calline Fyffe ("Fyffe").

On Christmas Day, 2008, Brown asked Knight, Debbie Shipp ("Shipp") and Angella Perez ("Perez") to carry approximately $565,000 in cash to Jamaica for her. The three were stopped by authorities in Montego Bay, Jamaica, who confiscated the money. Brown ordered the three couriers to lie and tell the authorities the money was theirs, in an unsuccessful effort to get it back. Brown threatened Shipp and Perez in order to make them lie as she wished.

. . .

Nearly a year later, on December 16, 2009, Knight was holding $1,000,000 in cash for Brown in a file cabinet he kept in the apartment he shared with Fyffe. Brown contacted Knight to let him know that she needed the money and would be coming to get it. Smith was scheduled to drive to Arizona that night with Gentle and Holovko to use the money to buy more marijuana. When Brown and Smith came to collect the money, they learned that $250,000 was missing. Brown became very upset with Knight and began screaming at him and hitting him, demanding her

money. She and Smith went to Brown's apartment to pick up Myrie. Myrie drove the four of them to an apartment in White Marsh, Maryland. On the way there, Brown was beating Knight in the face and at some point, she and Smith tied his hands with telephone cord.

At the apartment, Brown continued her beating and questioning of Knight but Knight insisted that he did not have the money. Leaving Myrie to guard Knight, Brown and Smith left to pick up Blake and Downer, and instructed them to force Knight to talk. When their efforts failed, Brown ordered Blake to kill Knight, telling him that she would give him and Downer $100,000 to do the murder and dispose of Knight's body. Blake took a kitchen knife and stabbed Knight multiple times as he lay in the bathtub.

Smith left that night for Arizona with Gentle and Holovko. Over the next few days, culminating on the night of the December 18-19, 2009 snow storm, Brown, Blake, Downer and Myrie used two different power saws to cut off Knight's legs and then dispose of the legs and Knight's torso in dumpsters.

. . .

In the aftermath of Knight's murder, Brown returned to Florida. On January 13, 2010, she was questioned at her home in Miramar, Florida, by Baltimore County Police Detectives Carroll Bollinger and Kevin Klimko about the disappearance of Knight. Knight's sister, Fyffe, had reported Knight missing on December 19. Shortly after the visit by the BPD, Brown had Carnegie [drove] her to Arizona, where she met with Mendez, who drove her across the border to Mexico. At the time, Mendez was an employee of the Mexican Consulate in Tucson, Arizona, who knew of Brown through his cousin "Carlos" who, along with his partner, "Benny," had been acquiring marijuana from Mexican suppliers and providing it to Smith for some time.

In Mexico, Brown joined Smith, whom Mendez had transported to Mexico sometime earlier. The two stayed with Mendez's family, including Campa, who was dating Mendez's sister, and discussed arrangements for continuing their business relationship using Campa, who had ties to the Arellano Felix Organization ("AFO"), a Tijuana-based drug cartel, as their source of supply. During the time Smith and Brown were in Mexico, Campa negotiated with them and a drug dealer to bring large amounts of marijuana to the U.S.

. . .

After spending a few days in Mexico, Brown traveled to Jamaica in February, 2010. Smith, who had been joined in Mexico by his girlfriend, Carolina Adigun, followed her there in March. In Jamaica, Smith expressed his desire to end his business relationship with Brown and attempted to get his share of the marijuana profits from her. Up to that point, Brown had held the majority of the proceeds and repatriated

them to Jamaica. Brown resisted him, violently at times. Outside of the apartment complex Smith owned, Brown burned Smith's clothes, vandalized his car, and shouted that the two of them had killed people. At another time, Brown encountered Smith and Adigun on the street and chased them with her car, eventually pointing a handgun at Smith and Adigun.

In April, 2010, Smith and Adigun returned to Mexico and stayed again with Campa for a few weeks. Campa and Smith continued to discuss the sale of marijuana. Smith and Campa planned to have a corrupt CBP agent smuggle Smith and Campa across the border. Adigun had legal status and would cross on her own. Smith and Adigun were eager to return, but Campa continued to delay the trip. Finally, on April 26, 2010, Campa informed them it was time to cross the border. Smith and Adigun got into Campa's SUV along with an associate of Campa, Alvarez. Alvarez had been with Smith, Adigun and Campa several times over their visit in Mexico, often discussing the drug trade with Smith and Campa. Alvarez also told them that he was a hit man for the cartels and had murdered many people.

With Campa driving, Alvarez in the passenger seat, and Smith and Adigun in the back, they set out for the border. On the drive, Campa pulled over. Adigun saw him walk to the back tire and reach into the wheel well. Campa then returned to the driver's seat and started to pullout. Campa handed something to Alvarez who immediately pulled out a gun and shot Smith twice in the head, killing him instantly. Alvarez then turned to shoot Adigun, who was able to deflect the gun, but was nevertheless struck several times. She was hit in the ear, hand, and pelvis. Campa and Alvarez, thinking that both were dead, began discussing where to dispose of the bodies. Adigun asked what she had done to deserve the shooting. Campa said that "she" paid him to do it, and paid him well. He also stated that "this is what happens when you mess with the boss lady's man." Alvarez and Campa continued to talk, and Adigun was able to throw herself from the open window of the vehicle and run across the highway. She was picked up by passing workers and taken to the hospital. Although she survived the injuries, Adigun was newly pregnant at the time, and lost the baby.

. . .

Subsequent to the deaths of Knight and Smith, Peter Blake introduced Brown to a new source of supply in California. This scheme involved packaging the marijuana purchased in California in what appeared to be cans of tomato sauce and shipping it to Maryland through common carriers. This new phase of the scheme was coordinated by Mowayne McKay, a young associate of Blake's, who assisted Brown with the purchasing and packaging of marijuana from California along with Hendrickson and Carnegie. Downer also purchased marijuana from California using the same tomato can method, and in March 2011, he was arrested while driving a blue van with several cans of actual tomato sauce. These cans had been mixed in with the cans containing marijuana to help avoid detection, in case any cans were opened by law enforcement.

At her trial in 2013, a jury found Brown guilty of all four charged offenses: conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana, kidnapping of Michael Knight in aid of racketeering, conspiracy to commit first-degree murder of Michael Knight in aid of racketeering, and the first-degree murder of Michael Knight in aid of racketeering. ECF 345. At sentencing, United States District Judge William D. Quarles sentenced Brown to concurrent life terms in prison for each of counts one, two, and four, with a concurrent 120-month sentence for the conspiracy charged in count three. ECF 385.

Brown now seeks a reduction of her sentence to time served. ECF 538.

## II.   Analysis

As part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C. § 3582(c), permitting courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239–41 (2018). While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons." *Id.* § 603(b)(1). Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied: (1) the defendant must have exhausted all administrative remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier.[1] *Id.* Once a motion is for compassionate release is properly filed, the Court follows a three-step inquiry: (1) determining whether "extraordinary and compelling reasons" render the inmate

---

[1] The Government does not contest that this administrative prerequisite has been satisfied.

eligible for compassionate release; (2) considering whether the factors set forth in 18 U.S.C.
§ 3553(a) weigh in favor of a sentence reduction; and (3) ensuring that the reduction is "consistent
with applicable policy statements issued by the Sentencing Commission." 18 U.S.C.
§ 3582(c)(1)(A).

### a. Extraordinary and Compelling Circumstances

To meet the first element for consideration under the First Step Act, then, Brown needs to
demonstrate extraordinary and compelling circumstances. Combining all of her filings, Brown
asserts a number of reasons: (1) a need to care for her minor daughter, who is residing with family
members in Jamaica who are suffering from health issues; (2) pandemic-related concerns at her
jail facility; (3) her health conditions; (4) her innocence and/or role in the offense; and (5)
rehabilitation. None of those factors individually, or when taken in combination, amounts to
extraordinary and compelling circumstances.

Taking each in turn, Brown cites the fact that her minor daughter is residing with family
members in Jamaica who are suffering from health issues. ECF 538. She argues that her daughter
is in need of a parent. *Id.* It is worth noting, however, that Judge Quarles, at sentencing, deemed
Brown to be responsible for the death of Smith, her daughter's father. ECF 458 at 24 ("[T]here is
sufficient evidence that the motive force behind the shooting, regardless of who pulled the trigger,
was the Defendant."). Setting that aside, the "death or incapacitation of a family member who is a
caregiver" has been recognized as an example of a potential extraordinary and compelling reason
which might permit this Court to consider release. *See* U.S.S.G. § 1B1.13, Application Note 1.[2]

---

[2] Pursuant to the statutory language, the Court must examine whether the defendant's request for
reduction is consistent with the Sentencing Commission's applicable policy statements. "To this
end, courts . . . once looked to Sentencing Guideline § 1B1.13 as the primary policy statement
informing the district court's analysis of what circumstances merit extraordinary and compelling
reasons for compassionate release." *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023).

Brown, however, has not shown death or incapacitation of a family member. Without evidence or records, she asserts her mother's age and medical conditions, but at least as of the last update provided to this Court, Brown's mother remains alive and there is no actual evidence of her incapacitation. Even if Brown had obtained her mother's medical records, she has also not established the absence of any other possible caregiver for her child, despite unsubstantiated assertions that other family members might be unwilling to take on the task. ECF 586 at 2. Thus, Brown has not shown extraordinary and compelling circumstances relating to her need to serve as caregiver for her minor child.

Brown also cites the pandemic-related difficulties at her jail facility as an extraordinary and compelling reason justifying her release. ECF 538 at 5–6. The BOP's efforts to prevent transmission within its facilities unquestionably present added hardships to the incarcerated population, as the BOP enacts various measures to best protect and care for its inmates. *See United States v. Hiller*, Cr. No. ELH-18-389, 2020 WL 2041673 *3–4 (D. Md. Apr. 28, 2020). However, those measures do not create extraordinary and compelling reasons to release all incarcerated individuals. *See, e.g.*, *United States v. Proctor*, Cr. No. DKC 04-160, 2020 WL 1864584 (D. Md. Apr. 14, 2020) ("The current pandemic state of emergency is of great concern to the entire country . . . Immediate release, however, is not a panacea . . . ."). Moreover, as inoculation becomes more prevalent within BOP facilities, inmates are better protected from complications and some of the

---

Recently, however, the Fourth Circuit joined its sister circuits "in determining that no applicable policy statement currently exists for defendant-filed § 3582(c)(1)(A) motions for compassionate release." *Id.* at 174; *see also United States v. McCoy*, 981 F.3d 271, 281 (4th Cir. 2020). As the Fourth Circuit explained, "[b]ecause the Sentencing Commission adopted § 1B1.13 prior to the FSA, it did not account for motions filed by defendants, and now solely applies to motions filed by the BOP." *Id.* at 174. Thus, this Court refers to the language and guidance of the outdated policy as "helpful guidance" but does not entirely rely upon it in its consideration of defendant's motion. *See id.*

more dramatic measures have been alleviated, allowing conditions at BOP facilities to progress closer to pre-pandemic standards.

Certainly, an inmate's particularly acute risk of COVID-19 complications has been deemed to be an extraordinary and compelling reason in certain cases. *See United States v. Kearney*, No. CR ELH-18-17, 2023 WL 2788626, at *15 (D. Md. Apr. 5, 2023) (collecting and summarizing cases). Brown asserted that she has "high blood pressure" without providing any medical records. This Court ordered her medical records, which confirmed that Brown does suffer from hypertension. ECF 610-3 at 2. However, upon her diagnosis in 2019, she initially refused medication, against medical advice. ECF 609-9 at 2. Once medication was prescribed to her in 2020, she has been largely noncompliant with taking it, leaving her hypertension not well-controlled. *See, e.g.*, ECF 609-10 at 13 (1/12/2021 note that she did not take her medication that day); ECF 609-10 at 6 (9/30/2021 note that she did not take her medication that day); ECF 610-3 at 4 (noting that she "does not take her blood pressure medication everyday, just sometimes"); ECF 610-3 at 2 (10/4/2022 note that she is "not taking her [medicine]" for hypertension). This Court cannot reward a defendant who is noncompliant with medical care, essentially creating her own heightened risk of serious illness. Moreover, Brown has further enhanced her risk of serious complications from a Covid infection by declining vaccination. ECF 610-2 at 45. In light of her significant contributions to any increased risk she faces, this Court cannot conclude that the pandemic creates an extraordinary and compelling reason warranting further consideration of her release.

In her most recent filing, Brown goes to great lengths contesting her guilt and claiming a minor role in the charged offenses. ECF 586 at 3–17. That type of inquiry is both inappropriate for a compassionate release motion and unpersuasive. A jury found Brown guilty beyond a reasonable

doubt. The trial judge, at her sentencing, referred to "clear evidence of her responsibility for Mr. Knight's killing." ECF 458 at 30. And the appeals court affirmed her convictions and multiple consecutive life sentences. If anything, Brown's continued unwillingness to accept responsibility for her actions leaves this Court less likely to believe her release is in the interest of society, as referenced below.

Finally, Brown appears to contend that her rehabilitation efforts warrant a reduced sentence. ECF 538. "[S]uccessful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam). Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam). And even if it were, Brown's rehabilitation, which consists largely of availing herself of educational opportunities within the prison, is not extraordinary, but just an example of the conduct expected of BOP inmates.

This Court has considered all of the factors above, both individually and in combination, and has determined that they are not extraordinary and compelling. Accordingly, Brown is ineligible for further consideration of compassionate release.[3]

**b.  § 3553(a) Factors**

Even had Brown established an extraordinary and compelling reason entitling her to further consideration, 18 U.S.C. § 3553(a) prescribes the factors the Court must assess in determining

---

[3] Brown cites to any number of federal cases, mostly from outside this jurisdiction, in which courts have found extraordinary and compelling circumstances warranting the release of particular defendants. *See, e.g.*, ECF 569, ECF 586 at 20–25. Several of those cases are from the spring and summer of 2020, when the pandemic ran rampant and there were no vaccines or treatments to protect medically vulnerable inmates from the virus. Regardless, this Court does not deem those cases very helpful, because the analysis of each defendant's circumstances is so particularized and unique.

whether it should reduce a defendant's sentence. *See United States v. Wirsing*, 943 F.3d 175, 183 (4th Cir. 2019); *United States v. Logan*, Cr. No. CCB-10-0203, 2019 WL 3391618 *1 (D. Md. July 26, 2019). Relevant here, those factors include (1) "the nature and circumstances of the offense;" (2) "the history and characteristics of the defendant;" (3) the need "to protect the public from further crimes of the defendant;" and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). The Court may also consider the defendant's conduct since her conviction. *See Logan*, 2019 WL 3391618 at *1.

Beginning with the nature and circumstances of her offenses, Brown's offenses could hardly be more serious: she served as the leader of a significant drug conspiracy and personally committed or ordered two murders in furtherance of the conspiracy's activities. Her motion for compassionate release, which strives to downplay her role as found by the jury and Judge Quarles, certainly does not indicate a recognition and acceptance of responsibility for her violent acts. Her more recent filing doubles down on that position. ECF 586.

Brown's history and characteristics do not weigh in her favor either. In the Presentence Investigation Report, she recounted having grown up in a loving, stable family environment. ECF 375 ¶ 92. The Court certainly recognizes, and does not discount, Brown's meaningful accomplishments during her term of imprisonment, including her successful completion of a wide variety of classes. ECF 538-1. However, as the Government notes, Brown's disciplinary record, while not horrendous, has been less than stellar. She has at least ten sanctioned incidents, though most are 300-level, or less serious, infractions. ECF 609-1 at 2–4. The most recent took place last year, in 2022. *Id.* at 2. At best, then, the Court views the history and characteristics of the defendant as a neutral factor, neither supporting nor counseling against a sentence reduction.

Turning to the third factor, the need to protect the public from further crimes of the defendant, the Court has absolutely no assurance that, if released, Brown would abstain from the type of serious and violent criminal conduct that led to her sentence.[4] Her continued denial or minimization of her involvement in the offenses of conviction undermines any notion that she could be trusted to abide by the law. She also denies or minimizes the disciplinary infractions she accrued in prison. ECF 586 at 17. Given her repeated demonstrated unwillingness to accept responsibility for her own wrongdoing, there is an acute continued need to protect the public from her conduct.

The final § 3553(a) factor is the need to avoid unwarranted sentence disparities. The life sentence imposed by Judge Quarles is entirely appropriate for a person convicted of being the leader of a significant drug trafficking organization and committing murder in aid of racketeering, particularly when the Government has also adduced sufficient evidence that the defendant ordered a second murder. It would be the reduction of Brown's sentence to time served which would epitomize an unwarranted sentence disparity.

In total, then, even if the second factor is deemed neutral, the first, third, and fourth § 3553(a) factors would weigh strongly against reducing Brown's sentence, assuming that she had been able to demonstrate the extraordinary and compelling reason needed to trigger such analysis.

III.    **Conclusion**

In conclusion, after considering all of the relevant factors, this Court concludes that Brown has not established an extraordinary and compelling reason to justify her release, and that even if

---

[4] While Brown argues that trafficking in marijuana is no longer viewed as a danger to society, ECF 586 at 18, murder remains a grave concern.

she had, her current sentence is most appropriate to accomplish the objectives described in 18

U.S.C. § 3553(a). Accordingly, Brown's Motion for Compassionate Release is DENIED.

A separate Order will issue.


DATED: April 13, 2023                                    /s/

Stephanie A. Gallagher
United States District Judge