IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | |
| JEAN BROWN, | * | Criminal No. SAG-11-0050 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Jean Brown, who is presently in Bureau of Prisons custody serving a life sentence at FCI Tallahassee, filed a Motion for Compassionate Release. ECF 648. The Government filed an opposition, ECF 678, and Brown filed a reply, ECF 680.[1] This Court has reviewed the filings and attachments and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons that follow, Brown's Motion is DENIED.

**I.      Factual Background**

The following facts are derived from the Government's summary of the facts proved at trial, as included in Brown's Amended Presentence Report. ECF 375.

> From at least 2000 until 2010, Jean Brown ran a marijuana trafficking organization that transported large amounts of marijuana from Arizona and California to Maryland for distribution in Maryland, Pennsylvania, New York and Washington, D.C. Brown used tractor trailers and car carriers to transport the money to the West Coast and the marijuana back to the East Coast. Brown's shipments came monthly, if not more frequently, in amounts which were initially a few hundred pounds. By

---

[1] Brown also filed a series of "motions for summary judgment," ECF 659, 660, and 661, which will be denied because summary judgment is not applicable to motions for compassionate release. Additionally, she filed a "motion request for disposition," ECF 689, which also asks that her compassionate release motion be granted in default because the government sought multiple extensions of time to file its opposition. That motion will also be denied. Compassionate release motions present serious issues of public safety and are inappropriate for default disposition.

1

2005, when she met Carl Smith, the monthly or bi-monthly shipments were 1,000 pounds of marijuana per shipment. The marijuana was purchased for approximately $500 per pound and sold for $1,000 per pound, for a revenue per month of $1,000,000. Brown transported the majority of her profits to Jamaica, where she was using it to build homes.

. . .

The main method of transportation of the marijuana was by tractor-trailer. Brown owned and controlled several trucking companies over the years, usually held in the name of another co-conspirator, and would use her trucks to transport large quantities of currency to Arizona and to return with a load of marijuana acquired from Mexican sources of supply. Former co-defendant Dmytro Holovko (aka "the Russian") and Herbert Gentle (aka "Bird") were two of Brown's drivers. In this fashion, Brown acquired approximately one ton of marijuana per month, purchasing it for approximately $500 per pound and selling it for double the price. As a result, her profit was approximately $1,000,000 per month.

From approximately 2000 until sometime around 2006 or 2007, Brown's primary partner was Wilmott Kerr (aka "Tough Luck") who showed Brown how to create a trucking business to provide an air of legitimacy while still smuggling large amounts of marijuana from the West Coast. Kerr and Brown shared a personal relationship which can only be described as volatile. In 2006 or 2007, Brown began doing business with Carl Smith, who already had a marijuana connection in Arizona. While Brown did not immediately cut ties with Kerr, she began phasing her operations to work more with Smith. As with Kerr, Brown also began a volatile personal relationship with Smith.

Brown's primary customers for the marijuana were individuals in Pittsburgh named "Zander" and "Yankee", though there will be testimony that Brown also distributed marijuana in Baltimore, Washington, D.C., and New York. Several witnesses will testify about their trips to Pittsburgh with Brown (and sometimes without her, but at her direction) to drop off marijuana or pick up money from Zander or Yankee.

In 2007 or 2008, Brown met Hubert Downer (aka "Doc") and Peter Blake (aka "Senator"), and agreed to provide them with marijuana to sell. Blake took an immediate liking to Brown, and the two spent a considerable amount of time together. Brown made several promises to Blake that she would involve him more in the business, but always kept him at arm's length.

It was common for Brown to keep people around her to perform everyday tasks and errands for her, or to simply accompany Brown as she conducted her affairs. These tasks and errands could range from the mundane (picking up furniture), to the extreme (flying to Arizona in the middle of the night to accuse Smith of cheating on her), to the illegal (carrying bulk cash to Jamaica, and delivering marijuana). At various times during the conspiracy, Michael Knight ("Knight""), Tamara Henry,

Dean Myrie (aka "Journey"), Jason Carnegie ("Dollar"), Clive White ("Kung Fu"), and others acted in this capacity for Brown.

Knight not only performed errands for Brown; he was also a close associate in her marijuana trafficking. He accompanied her to Pittsburgh to deliver marijuana, carried money to Jamaica for her, and held large amounts of cash for her in his apartment he shared with his sister, Calline Fyffe ("Fyffe").

On Christmas Day, 2008, Brown asked Knight, Debbie Shipp ("Shipp") and Angella Perez ("Perez") to carry approximately $565,000 in cash to Jamaica for her. The three were stopped by authorities in Montego Bay, Jamaica, who confiscated the money. Brown ordered the three couriers to lie and tell the authorities the money was theirs, in an unsuccessful effort to get it back. Brown threatened Shipp and Perez in order to make them lie as she wished.

Nearly a year later, on December 16, 2009, Knight was holding $1,000,000 in cash for Brown in a file cabinet he kept in the apartment he shared with Fyffe. Brown contacted Knight to let him know that she needed the money and would be coming to get it. Smith was scheduled to drive to Arizona that night with Gentle and Holovko to use the money to buy more marijuana. When Brown and Smith came to collect the money, they learned that $250,000 was missing. Brown became very upset with Knight and began screaming at him and hitting him, demanding her money. She and Smith went to Brown's apartment to pick up Myrie. Myrie drove the four of them to an apartment in White Marsh, Maryland. On the way there, Brown was beating Knight in the face and at some point, she and Smith tied his hands with telephone cord.

At the apartment, Brown continued her beating and questioning of Knight but Knight insisted that he did not have the money. Leaving Myrie to guard Knight, Brown and Smith left to pick up Blake and Downer, and instructed them to force Knight to talk. When their efforts failed, Brown ordered Blake to kill Knight, telling him that she would give him and Downer $100,000 to do the murder and dispose of Knight's body. Blake took a kitchen knife and stabbed Knight multiple times as he lay in the bathtub.

Smith left that night for Arizona with Gentle and Holovko. Over the next few days, culminating on the night of the December 18-19, 2009 snow storm, Brown, Blake, Downer and Myrie used two different power saws to cut off Knight's legs and then dispose of the legs and Knight's torso in dumpsters.

. . .

In the aftermath of Knight's murder, Brown returned to Florida. On January 13, 2010, she was questioned at her home in Miramar, Florida, by Baltimore County Police Detectives Carroll Bollinger and Kevin Klimko about the disappearance of Knight. Knight's sister, Fyffe, had reported Knight missing on December 19.

3

Shortly after the visit by the BPD, Brown had Carnegie drive her to Arizona, where she met with Mendez, who drove her across the border to Mexico. At the time, Mendez was an employee of the Mexican Consulate in Tucson, Arizona, who knew of Brown through his cousin "Carlos" who, along with his partner, "Benny," had been acquiring marijuana from Mexican suppliers and providing it to Smith for some time.

In Mexico, Brown joined Smith, whom Mendez had transported to Mexico sometime earlier. The two stayed with Mendez's family, including Campa, who was dating Mendez's sister, and discussed arrangements for continuing their business relationship using Campa, who had ties to the Arellano Felix Organization ("AFO"), a Tijuana-based drug cartel, as their source of supply. During the time Smith and Brown were in Mexico, Campa negotiated with them and a drug dealer to bring large amounts of marijuana to the U.S.

. . .

After spending a few days in Mexico, Brown traveled to Jamaica in February, 2010. Smith, who had been joined in Mexico by his girlfriend, Carolina Adigun, followed her there in March. In Jamaica, Smith expressed his desire to end his business relationship with Brown and attempted to get his share of the marijuana profits from her. Up to that point, Brown had held the majority of the proceeds and repatriated them to Jamaica. Brown resisted him, violently at times. Outside of the apartment complex Smith owned, Brown burned Smith's clothes, vandalized his car, and shouted that the two of them had killed people. At another time, Brown encountered Smith and Adigun on the street and chased them with her car, eventually pointing a handgun at Smith and Adigun.

In April, 2010, Smith and Adigun returned to Mexico and stayed again with Campa for a few weeks. Campa and Smith continued to discuss the sale of marijuana. Smith and Campa planned to have a corrupt CBP agent smuggle Smith and Campa across the border. Adigun had legal status and would cross on her own. Smith and Adigun were eager to return, but Campa continued to delay the trip. Finally, on April 26, 2010, Campa informed them it was time to cross the border. Smith and Adigun got into Campa's SUV along with an associate of Campa, Alvarez. Alvarez had been with Smith, Adigun and Campa several times over their visit in Mexico, often discussing the drug trade with Smith and Campa. Alvarez also told them that he was a hit man for the cartels and had murdered many people.

With Campa driving, Alvarez in the passenger seat, and Smith and Adigun in the back, they set out for the border. On the drive, Campa pulled over. Adigun saw him walk to the back tire and reach into the wheel well. Campa then returned to the driver's seat and started to pullout. Campa handed something to Alvarez who immediately pulled out a gun and shot Smith twice in the head, killing him instantly. Alvarez then turned to shoot Adigun, who was able to deflect the gun, but was nevertheless struck several times. She was hit in the ear, hand, and pelvis.

4

Campa and Alvarez, thinking that both were dead, began discussing where to dispose of the bodies. Adigun asked what she had done to deserve the shooting. Campa said that "she" paid him to do it, and paid him well. He also stated that "this is what happens when you mess with the boss lady's man." Alvarez and Campa continued to talk, and Adigun was able to throw herself from the open window of the vehicle and run across the highway. She was picked up by passing workers and taken to the hospital. Although she survived the injuries, Adigun was newly pregnant at the time, and lost the baby.

. . .

Subsequent to the deaths of Knight and Smith, Peter Blake introduced Brown to a new source of supply in California. This scheme involved packaging the marijuana purchased in California in what appeared to be cans of tomato sauce and shipping it to Maryland through common carriers. This new phase of the scheme was coordinated by Mowayne McKay, a young associate of Blake's, who assisted Brown with the purchasing and packaging of marijuana from California along with Hendrickson and Carnegie. Downer also purchased marijuana from California using the same tomato can method, and in March 2011, he was arrested while driving a blue van with several cans of actual tomato sauce. These cans had been mixed in with the cans containing marijuana to help avoid detection, in case any cans were opened by law enforcement.

At her trial in 2013, a jury found Brown guilty of all four charged offenses: conspiracy to distribute and possess with intent to distribute 1000 kilograms or more of marijuana, kidnapping of Michael Knight in aid of racketeering, conspiracy to commit first-degree murder of Michael Knight in aid of racketeering, and the first-degree murder of Michael Knight in aid of racketeering. ECF 345. At sentencing, United States District Judge William D. Quarles sentenced Brown to concurrent life terms in prison for each of counts one, two, and four, with a concurrent 120-month sentence for the conspiracy charged in count three. ECF 385.

Brown now seeks a reduction of her sentence. ECF 648.

II.   **Analysis**

Generally, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023). But as part of the First Step Act, enacted in December, 2018, Congress expanded 18 U.S.C. § 3582(c), permitting

5

courts to reduce an existing term of imprisonment where "extraordinary and compelling reasons warrant such a reduction." *See* 18 U.S.C. § 3582(c)(1)(A)(i) (2018); Pub. L. No. 115-391, tit. VI, § 603(b), 132 Stat. 5194, 5239-41 (2018). While previously, any motion for compassionate release had to be initiated by the Bureau of Prisons ("BOP"), the First Step Act granted defendants the ability to move the Court for a reduction in their sentence for "extraordinary and compelling reasons." § 603(b)(1); 18 U.S.C. § 3582(c)(1)(A)(i). Before a defendant's motion can be filed with the Court, one of two conditions must be satisfied: (1) the defendant must have exhausted all administrative remedies to appeal the BOP's failure to bring a motion on his behalf, or (2) thirty days must have lapsed "from the receipt of such a request by the warden of the defendant's facility," whichever is earlier. 18 U.S.C. § 3582(c)(1)(A)(i). Once a motion for compassionate release is properly filed, the Court engages in a two-step process: determining whether "extraordinary and compelling reasons" render the inmate eligible for compassionate release and considering whether the factors set forth in 18 U.S.C. § 3553(a) weigh in favor of a sentence reduction. *See* 18 U.S.C. § 3582(c)(1)(A)(i).

The Fourth Circuit has held that "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020). The relevant policy statement is U.S.S.G. § 1B1.13, entitled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" (the "Policy Statement"). The Sentencing Commission recently amended that Policy Statement, with the amendments taking effect on November 1, 2023.

Before the November, 2023 amendments, the Policy Statement began with the phrase: "Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court

6

may reduce a term of imprisonment" for certain enumerated reasons. U.S.S.G. § 1B1.13 (2021). In *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020), the Fourth Circuit determined that the language in the Policy Statement did not encompass motions filed by defendants themselves, meaning that in connection with such motions district courts were "empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise." *Id.* at 284 (quoting *United States v. Brooker*, 976 F.3d 228, 230 (2020)).

The November 1, 2023 amendments changed the beginning of the Policy Statement to read: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment" for specified reasons. U.S.S.G. § 1B1.13 (2023) (emphasis added). Thus, the amended Policy Statement is now expressly applicable to defendant-filed motions, like Brown's.

### a. Extraordinary and Compelling Circumstances

To meet the first element for consideration under the First Step Act, then, Brown needs to demonstrate extraordinary and compelling circumstances. Brown asserts a number of reasons: (1) a need to care for her minor daughter and her mother; (2) an improper crime of violence enhancement; (3) eligibility for a zero-point offender adjustment; (4) eligibility for a safety-valve reduction; (5) sentencing disparity with her co-defendant; (6) an unusually long sentence; (7) Section 404 of the First Step Act; (8) a First Step Act time credits request; (9) rehabilitation/risk of recidivism, and (10) her previous incarceration at FCI Dublin. Many of those factors do not align with any of the "extraordinary and compelling reasons" enumerated at U.S.S.G. § 1B1.13 (2023). But to the extent they can be considered, none of those factors individually, or when taken in combination, amounts to extraordinary and compelling circumstances.

7

Taking each in turn, Brown first cites the fact that her minor daughter is residing with her mother, who has health issues. ECF 648-1 at 23–25. This Court again notes, however, that Judge Quarles, at sentencing, deemed Brown to be responsible for the death of Smith, her daughter's father. ECF 458 at 24 ("[T]here is sufficient evidence that the motive force behind the shooting, regardless of who pulled the trigger, was the Defendant."). Setting that aside, U.S.S.G. § 1B1.13 permits "family circumstances" to be an extraordinary and compelling reason where an individual has a minor child (under 18 years old) and the caregiver of that child has died or is unable to care for the child. Once again, while Brown's mother is suffering from health conditions, she remains alive and there is no actual evidence of her incapacitation or her inability to care for Brown's now-teenaged child. There is also evidence of other family members (including adult siblings) who may be able to assist. ECF 648-1 at 25. Thus, Brown has not shown extraordinary and compelling circumstances relating to her need to serve as caregiver for her minor child or her mother.

Brown's next series of arguments are guidelines-based arguments that do not constitute reasons recognized in U.S.S.G. § 1B1.13. They also lack merit. In her second argument, she contends that she should not have received a crime of violence enhancement because conspiracy to commit murder is not a crime of violence. However, her sentence was not calculated using a crime of violence enhancement. Instead, she was sentenced pursuant to the murder cross-reference in U.S.S.G. § 2D1.1(d)(1). That cross-reference, to U.S.S.G. § 2A1.1, fixed Brown's offense level at 43. *See* ECF 375 at ¶ 30.

Brown's third argument is that she is eligible for the zero-point offender adjustment in U.S.S.G. § 4C1.1. She is not. That guideline requires a list of requirements to be met, and Brown fails to meet at least two of them. Her offense both "use[d] violence . . . in connection with the offense" and resulted in death or serious bodily injury. *Id.* Specifically, the kidnapping, torture,

8

and murder of Knight, including his later dismemberment, render her ineligible for the adjustment under U.S.S.G. § 4C1.1(a).

Brown's fourth argument contends that she is eligible for the safety valve reduction in U.S.S.G. § 5C1.2(a)(1)–(5). Again, to avail oneself of that reduction, a defendant must satisfy each of five requirements. Brown fails three of them: she used violence in connection with her offense, the offense resulted in death and serious bodily injury, and she was an organizer, leader, manager, or supervisor in the criminal activity. *See id.*

Brown's fifth contention is that she received a disparate sentence as compared to her co-defendant. She did not elaborate on which co-defendant she referenced. However, none of her co-defendants is similarly situated to her. The closest in terms of the severity of the charges, Hubert Downer, accepted responsibility pursuant to his plea of guilty and received sentencing credit accordingly. Additionally, Downer was not an organizer or leader in the offenses, as he took direction from Brown. Finally, Brown also received an upward adjustment for testifying falsely at her trial, which Downer did not. The disparities in the defendants' sentencing, therefore, are readily explained by individual circumstances and do not justify a reduction for Brown.

Brown next argues that she is entitled to a reduction under the "unusually long sentence" provision described in U.S.S.G. § 1B1.13. That provision applies where (1) a defendant has served at least 10 years of her prison sentence, (2) there was a change in law other than a non-retroactive Guidelines amendment, (3) that change resulted in a "gross disparity" between the sentence being served and the sentence likely to be imposed at the time of the motion's filing, and (4) after individualized assessment of the defendant's circumstances. U.S.S.G. § 1B1.13(b)(6). The provision is patently inapplicable here. Although Brown has now served at least 10 years of her sentence, there has been no change in the law that would result in a "gross disparity" in her

sentence. The murder cross-reference remains the same, and Brown's advisory guideline range would still be 43, the highest possible level, before her *upward* adjustments for her leadership role and obstruction of justice. Particularly given the sentencing judge's comments about his belief that her conduct fully warranted a life sentence, there is no reason to believe a lesser sentence would be imposed today. *See* ECF 458 at 43.

Seventh, in another argument outside the bounds of § 1B1.13, Brown argues that her sentence should be reduced pursuant to Section 404 of the First Step Act. That provision, however, grants relief to persons convicted of crack cocaine offenses. As Brown's conviction involved large-scale marijuana trafficking, Section 404 does not afford her sentencing relief.

Brown also argues that this Court should consider her First Step Act time credits in evaluating this motion for compassionate release. However, a compassionate release motion is not the proper vehicle for seeking application of those credits. Brown must first exhaust her administrative remedies and, if no relief is granted, should seek habeas relief pursuant to 28 U.S.C. § 2241 in the appropriate jurisdiction.

Next, Brown again contends that she has been rehabilitated and is at low risk for recidivism. This Court commends Brown for seeking to improve herself through programming and education. And Brown, of course, has reached an age in her mid-50s at which the likelihood of recidivism steadily decreases. U.S.S.G. § 1B1.13(b)(2), however, does not allow the "age of the individual" to count as an extraordinary and compelling reason until the individual is over age 65. And rehabilitation alone is not an extraordinary and compelling reason justifying further consideration of compassionate release. *See* 28 U.S.C. § 994(t). The seriousness of Brown's criminal conduct, in combination with her leadership role and her disciplinary infractions while incarcerated, leaves

this Court less than confident about her potential for recidivism despite the positive strides she has exhibited.

Finally, Brown cites her four-month incarceration at FCI Dublin as a basis for finding an extraordinary and compelling reason. Correctional officers from that facility have been sentenced for criminal sexual abuse and criminal sexual conduct involving inmates, and there is other evidence that some inmates had "limited to no access to constitutionally adequate medical and mental health care, programming, and timely administrative relief." ECF 654-1. Section 1B1.13(b)(4) does allow consideration of compassionate release for certain victims of abuse who sustained particularly serious injuries and offer evidence of judicial or administrative findings in their favor. But Brown offers no such evidence. She does not specifically allege that she herself suffered any abuse at FCI Dublin and, in fact, asserts that she has suffered from mental health issues because the closure of FCI Dublin impaired her ability to complete her business degree. ECF 648-1 at 21.

This Court has considered all of the factors above, both individually and in combination, and has determined that they are not extraordinary and compelling. Accordingly, Brown is ineligible for further consideration of compassionate release.

b.  § 3553(a) Factors

This Court will largely reiterate its analysis from its previous opinion with respect to the statutory sentencing factors, because the analysis remains largely unchanged. Even had Brown established an extraordinary and compelling reason entitling her to further consideration, 18 U.S.C. § 3553(a) prescribes the factors the Court must assess in determining whether it should reduce a defendant's sentence. *See United States v. Wirsing*, 943 F.3d 175, 183 (4th Cir. 2019); *United States v. Logan*, Cr. No. CCB-10-0203, 2019 WL 3391618 *1 (D. Md. July 26, 2019).

Those factors include (1) "the nature and circumstances of the offense;" (2) "the history and characteristics of the defendant;" (3) "the need to protect the public from further crimes of the defendant;" and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a). The Court may also consider the defendant's conduct since her sentencing. *See Logan*, 2019 WL 3391618 at *1.

Beginning with the nature and circumstances of her offenses, Brown's offenses could hardly be more serious: she served as the leader of a significant drug conspiracy and personally committed or ordered two murders in furtherance of the conspiracy's activities. Her instant motion for compassionate release, while more subdued in tone than her last filing, still does not indicate a recognition and acceptance of responsibility for her violent acts.

Brown's history and characteristics do not weigh in her favor either. In the Presentence Investigation Report, she recounted having grown up in a loving, stable family environment. ECF 375 at ¶ 92. The Court certainly recognizes, and does not discount, Brown's meaningful accomplishments during her term of imprisonment, including her successful completion of a wide variety of classes. ECF 538-1. However, as the Government notes, Brown's disciplinary record, while not horrendous, has been less than stellar. She has at least twelve sanctioned incidents, though most are 300-level, or less serious, infractions. ECF 678-2. The most recent two infractions took place in 2023. *Id.* At best, then, the Court views the history and characteristics of the defendant as a neutral factor, neither supporting nor counseling against a sentence reduction.

Turning to the third factor, the need to protect the public from further crimes of the defendant, the Court has absolutely no assurance that, if released, Brown would abstain from the type of serious and violent criminal conduct that led to her sentence. While her instant motion for

compassionate release does not discuss her involvement in the offenses of conviction or her disciplinary infractions, she certainly does not accept responsibility for those actions, and this Court remains concerned about public safety.

The final § 3553(a) factor is the need to avoid unwarranted sentence disparities. The life sentence imposed by Judge Quarles is entirely appropriate for a person convicted of being the leader of a significant drug trafficking organization and committing murder in aid of racketeering, particularly when the Government has also adduced sufficient evidence that the defendant ordered a second murder. It would be the reduction of Brown's sentence to time served which would epitomize an unwarranted sentence disparity.

In total, then, even if the second factor is deemed neutral, the first, third, and fourth § 3553(a) factors would weigh strongly against reducing Brown's sentence, assuming that she had been able to demonstrate the extraordinary and compelling reason needed to trigger such analysis.

### III. Conclusion

In conclusion, after considering all of the relevant factors, this Court concludes that Brown still has not established an extraordinary and compelling reason to justify her release, and that even if she had, her current sentence is most appropriate to accomplish the objectives described in 18 U.S.C. § 3553(a). Accordingly, Brown's Motion for Compassionate Release, ECF 648, is DENIED, as are her procedural motions at ECF 659, 660, 661, and 689.

A separate Order will issue.

DATED: October 8, 2025               /s/
                                     Stephanie A. Gallagher
                                     United States District Judge